## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NANOSTRING TECHNOLOGIES, INC., *et al.*,[1] | Case No. 24-10160 (CTG) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF R. BRADLEY GRAY
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, R. Bradley Gray, pursuant to 28 U.S.C. § 1746, and under penalty of perjury, declare the following to the best of my knowledge, information and belief:

1.　　I am the President and Chief Executive Officer of NanoString Technologies, Inc. ("NanoString") and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or the "Company"). As President and Chief Executive Officer, I am familiar with the day-to-day operations, business and financial affairs, and books and records of the Debtors. I joined NanoString in June 2010 as President and Chief Executive Officer.

2.　　Prior to joining NanoString, I worked at Genzyme Genetics, the diagnostics division of biotechnology pioneer Genzyme, in various roles. Most recently, I served as the Vice President of Products and Business Development at Genzyme Genetics from 2008 to 2010, where I led the development of molecular diagnostics and partnering activities. Prior to this role, I served as the Vice President of Business and Strategic Development from 2006 to 2008 and the Director of Corporate Development from 2004 to 2008.

---

[1]　The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are NanoString Technologies, Inc. (4687), NanoString Technologies International, Inc. (2723), NanoString Technologies Netherlands B.V., and NanoString Technologies Germany GmbH. The Debtors' headquarters is located at 530 Fairview Avenue North, Suite 2000, Seattle, WA 98109.

3.      I started my career as a management consultant at McKinsey & Company from 2000 to 2004. I hold a bachelor's degree in Economics and Management from Oxford University, where I studied as a British Marshall Scholar, and a bachelor's degree in Chemical Engineering from the Massachusetts Institute of Technology.

4.      On February 4, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (collectively, the "Petitions") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The Debtors intend to continue in possession of their assets and the management of their business as debtors in possession during the pendency of these chapter 11 cases (collectively, the "Chapter 11 Cases"). To minimize the adverse effects on their business, the Debtors filed motions and pleadings seeking various forms of relief (collectively, the "First Day Pleadings"). I submit this declaration (the "Declaration") to assist the Court and the parties in interest in understanding the circumstances that compelled the commencement of these Chapter 11 Cases, and in support of the Debtors' Petitions and the First Day Pleadings.

5.      All facts set forth in the Declaration are based on my personal knowledge, my communications with members of the Debtors' senior management team and professional advisors, my review of relevant documents, or my opinions developed through my overall professional experience and my personal knowledge of the Debtors' history, financial condition, and business operations and affairs.

6.      I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors. If called as a witness, I could and would testify competently to the matters set forth herein.

## INTRODUCTION

7.      NanoString creates different technologies that allow scientists to examine the genetic composition of biological samples at varying levels of precision.  The Debtors generate revenue through the sale of different physical instruments and chemical reagents needed to conduct science experiments that allow researchers to understand the expression of genes across a particular biological sample or within a specific region or cell of that sample.

8.      The Debtors' customers include Fortune 500 biopharmaceutical companies, major research centers, and clinical laboratories, whose researchers conduct studies in fields such as genomics, oncology, immunology, and neurology.  The Company's proprietary technologies empower its customers to unlock valuable information from biological material that is often subsequently used to develop new pharmaceutical products and therapies.  NanoString has a global reach, selling its products to customers worldwide, including in Europe and Asia.

9.      NanoString is a pioneer in the scientific field of "spatial biology," described in further detail herein, and has experienced increasing revenues in recent years.  Nonetheless, the Debtors have faced several challenges in the months leading to the Petition Date that have necessitated these chapter 11 cases.  Namely, the Debtors are the subject of an unfair, wide-ranging litigation campaign in multiple countries commenced by one of their competitors, 10x Genomics, Inc. ("10x").  Most recently, in November 2023, the Debtors received an unfavorable verdict in the United States District Court for the District of Delaware in a patent litigation case commenced by 10x, which awarded 10x approximately $31.6 million.  Although the Debtors are generating revenue, it is not currently sufficient to meet the Debtors' long-term liquidity needs, including either paying the damages award or putting up a bond to obtain a stay of enforcement pending appeal.

10.     To help address these challenges, in the months leading to the Petition Date, the Debtors engaged in significant operational restructuring efforts.  The Debtors also retained Willkie Farr & Gallagher LLP ("Willkie"), Young Conaway Stargatt & Taylor, LLP ("YCST"), Perella Weinberg Partners LP ("PWP"), AlixPartners, Inc. ("Alix") and Kroll Restructuring Administration LLC ("Kroll," and collectively with Willkie, YCST, PWP, and Alix, the "Restructuring Advisors").  Among other things, the Restructuring Advisors assisted the Company with a prepetition marketing process.  This marketing process has proven competitive, and the Debtors anticipate consummating a sale of all of their equity or all or substantially of their assets in these Chapter 11 Cases—either to a bidder they have identified through this process, or a new bidder that materializes at a court-supervised auction.

11.     Prior to the Petition Date, the Debtors secured a commitment from their only prepetition secured lenders—the Prepetition 2026 Secured Noteholders (defined below) for a $40.0 million new money superpriority debtor-in-possession financing facility (the "DIP Facility"), including up to $12.5 million on an interim basis and secured by priming liens on substantially all of the Debtors' assets.  The DIP Facility matures on the earlier of July 31, 2024 or the effective date of a chapter 11 plan, and is designed to ensure that the Debtors have sufficient funds to complete their robust marketing process in chapter 11 and consummate a value-maximizing sale of their assets or equity.  The DIP Facility is the product of extensive negotiations between the Debtors and the Prepetition 2026 Secured Noteholders and is critical to maintaining the Debtors' going concern value.

12.     The Debtors' decision to commence these cases was informed by the challenges presented by ongoing litigation, the headwinds facing their industry generally, and several weeks of discussions by the Restructuring Committee of the Company's Board of Directors, the Debtors'

management team, and the Restructuring Advisors, and was made after consideration of the Debtors' available options. Although the Debtors were unable to consummate a sale outside of chapter 11 on the timeframe necessitated by their liquidity situation, their marketing process is in advanced stages and has laid the foundation for the Debtors to efficiently negotiate and consummate a value-maximizing transaction within these chapter 11 cases for the benefit of their creditors and all stakeholders.

13.     To familiarize the Court with the Debtors, their business, the circumstances leading up to these Chapter 11 Cases, and the relief the Debtors seek in the First Day Pleadings, this Declaration is organized as follows:

- **Part I** provides an overview of the Debtors' corporate history, structure, and business operations;

- **Part II** describes the Debtors' prepetition capital structure;

- **Part III** describes the events leading up to the filing of the Chapter 11 Cases;

- **Part IV** describes the Debtors' proposed debtor-in-possession financing and use of cash collateral; and

- **Part V** provides the factual support for the Petitions and First Day Pleadings.

## I.    The Debtors' Corporate History, Structure, and Business Operations

### A.    General Background, History, and Key Products

14.     Founded in 2003, NanoString develops, manufactures, and markets different technologies that empower scientists to analyze biological samples. The Company's different technologies unlock scientifically valuable and clinically actionable information from minute amounts of biological material, and they are often used in connection with pharmaceutical product development and human clinical trials of potential new therapies. NanoString's products are used for scientific discovery and clinical research applications, primarily in the scientific fields of

genomics (which is the study of genes) and proteomics (which is the study of proteins). NanoString has placed more than 1,500 scientific instruments in laboratories worldwide, which researchers have used to publish more than 7,500 peer-reviewed scientific publications.

15.     NanoString's products enable two different types of scientific experiments.  "Bulk gene expression" experiments analyze the expression of several hundred genes from the cells in a sample *without* tracking the location of the cells within the sample.  The Company is also a pioneer in the scientific field of "spatial biology" experiments, a relatively new technique that measures the expression of genes and proteins in a tissue sample while simultaneously tracking the location of the molecules to a) regions within a tissue, b) individual cells, or even c) areas within a cell.

16.     The Debtors maintain their headquarters in Seattle, Washington.  The Company's customer base is composed primarily of academic and government research laboratories, biopharmaceutical companies, and clinical laboratories across the globe.  Some examples of the Company's customers include major research centers such as the National Institutes of Health, the MD Anderson Cancer Center, and Oxford University, and major biopharmaceutical companies such as Merck, Pfizer, and Moderna.

17.     Demand for NanoString's technologies has been driven by researchers in areas such as cancer, immunology, neurology, and infectious disease.  Researchers in these fields are increasingly attempting to determine which genes or proteins are important in disease-related biological processes so potential treatments might be developed.  In both life sciences research and clinical medicine, there is a growing need for improved technologies that can easily, precisely, and rapidly measure the expression (activation state) of hundreds to thousands of genes simultaneously across a large number of samples.  Furthermore, there is an emerging desire for technologies that enable researchers and clinicians to understand how gene and protein expression varies based on

the specific location of cells within a tissue as it is naturally situated in the body—without the need to destroy the physical structure of the biological sample.

18.     With this in mind, NanoString's strategy is to develop and sell both the scientific instruments and the chemical reagents needed for experiments.  Some of NanoString's products enable "bulk gene expression", while others enable "spatial biology."  As illustrated by analogy to a city map in Figure 1 below, bulk gene expression analysis involves homogenizing (which means breaking down the physical structure of) a biological sample and analyzing that sample to show scientists what genes are turned on and off (*i.e.*, which genes are expressed and which are not, as measured by ribonucleic acid, or "RNA").  By contrast, spatial biology involves examining a particular region of cells, an individual cell, or a subcellular area to understand the behavior of genes in that area—all while keeping the biological sample intact.



Figure 1.

19.     Accordingly, the Company offers a portfolio of different technologies to genomics and proteomics researchers that (i) are easy to use across multiple experimental scales or approaches and (ii) offer consistent, reproduceable scientific results in a variety of biological

sample types.  The Company offers its customers three different systems, each designed to enable a different type of experiment: the nCounter Analysis System ("nCounter"), the GeoMx Digital Spatial Profiler ("GeoMx"), and the CosMx Spatial Molecular Imager ("CosMx").  In addition to these analytical systems, the Debtors also offer the cloud-based AtoMx Spatial Informatics Platform ("AtoMx") to store data and images.  Each of these products is described in detail below and illustrated in Figure 2 below.



Figure 2.

20.    **nCounter.**  In 2008, the Debtors commercially launched nCounter, an instrument that is used to conduct bulk gene expression analysis.  nCounter is capable of "multiplex" bulk gene expression analysis, meaning it can measure the expression of more than one gene in a sample.  Scientific researchers use nCounter by purchasing the instrument and chemical reagents referred to as "gene expression panels" from NanoString.  Each panel contains the chemical reagents that characterize the genes that are associated with a particular disease or biological process, depending on the researcher's area of interest.  For instance, the nCounter Immunology Panel contains over 500 general immunology genes and can be used by researchers who study allergies, autoimmune diseases, and the immune response to infectious diseases.  The researcher combines his or her selected tissue sample with the NanoString gene expression panel and inserts

the combined material into the nCounter instrument for analysis.  The biological material in the panel contains certain "reporter probes," which are chemical reagents that attach to specific RNA targets.  The reporter probes will identify and quantify those biological targets if they exist in the researcher's sample.

21.     nCounter uses the information provided by the "reporter probes" to measure specific quantities of selected RNA at their average levels across the numerous cells throughout the sample.  Because each target RNA is associated with a specific gene, the number of specific RNA molecules detected by nCounter tells the researcher the degree to which each gene is expressed (i.e., how "on" or "off" it is).  nCounter can be used to process dozens of biological samples per day, and can analyze the activity of up to 800 genes in each biological sample in a single experiment, with results available in less than 24 hours.  nCounter also involves fewer experimental steps as compared to other multiplex bulk gene expression analysis technologies. The ease of measuring up to 800 genes in a single, simple experiment makes nCounter appealing to customers, as similar technologies can involve a more complicated process for researchers.

22.     **GeoMx.**  GeoMx was launched in 2019 and is a groundbreaking product platform in the scientific field of spatial biology.  A researcher using GeoMx will generally prepare tissue samples for analysis using a traditional microscope:  he or she will mount a slice of tissue on a glass microscope slide, stain it with special reagents purchased from NanoString, and insert the slide into a GeoMx instrument.  GeoMx will image the slide using a microscope built into the instrument, and will then allow the researcher to select regions of interest within the tissue sample for further analysis.  The automated instrument then prepares samples from the region of interest that the researcher has selected.  Finally, the researcher places the sample into nCounter or a DNA sequencer manufactured by Illumina, Inc. for analysis.

23.    In contrast to the results produced by nCounter, the results produced from a GeoMx experiment are more precise (as depicted in Figure 3 below): instead of showing what genes appear *on average across* a broken-down biological sample, GeoMx allows a researcher to see the specific genes that appear in a *selected area* of an intact sample.  For example, if a researcher's tissue sample contains a tumor, GeoMx would enable the researcher to see how genes are behaving solely within the tumor or a specific region thereof, or alternatively, to see how genes are behaving in the area outside of the tumor.  Using GeoMx, researchers can obtain information on the biology of the selected region of interest, measuring up to approximately 19,000 RNA targets or up to more than 570 proteins.



Figure 3.

24.    **CosMx.**  Launched in December 2022, CosMx is a new and different product platform in the scientific field of spatial biology.  Whereas GeoMx can profile gene expression in a selected region that may contain multiple cells or cell types, CosMx can go much further and offers even more precision, providing spatial profiling of RNA and protein targets *at a single-cell and sub-cellular resolution*.  The results from a CosMx experiment show a researcher the expression level of thousands of genes within each individual cell in a sample, producing an

enormous amount of usable data.  The commercially available version of CosMx can be used to analyze up to 6,000 RNA targets, or up to 120 protein targets.  NanoString has recently announced that the capabilities of CosMx have been expanded to image the RNA for every human gene simultaneously at single-cell resolution—a breakthrough capability that the scientific community has long sought.  CosMx is groundbreaking technology for a level of precision that cannot be achieved with other spatial biology technologies.

25.    **AtoMx.**  Researchers' desire for ever larger amounts of data in their spatial biology experiments has led to significant "big data" management issues, including the ability to store, access and efficiently analyze experimental data at a reasonable cost.  In December 2022, the Debtors launched AtoMx (conceptualized in Figure 4 below) to take advantage of significant advances in cloud computing and facilitate the easy storage of large data sets and images generated by spatial biology experiments.  AtoMx also enables researchers to perform image analysis and data visualization, as well as sharing of data and analysis with collaborators, using scalable and on-demand cloud computing.  AtoMx is purchased by researchers using CosMx, who can easily and quickly analyze the substantial scientific data and tissue images generated by spatial biology experiments, while avoiding the large computing infrastructure and security costs associated with operating in-house data centers.



Figure 4.

26.     The Debtors use third-party manufacturers to produce some of their instruments and manufacture other instruments in-house.   The Debtors manufacture kits containing the chemical reagents used for experiments at their facilities in the greater Seattle, Washington area. In addition to producing and marketing their instruments and consumables, the Debtors focus a substantial portion of their resources on research and development of new technologies and improvements to their existing products.

**B.     Corporate Structure**

27.     Debtor NanoString Technologies, Inc. is a publicly traded company and its shares trade on the Nasdaq Capital Market under the ticker NSTG.   As of the Petition Date, NanoString Technologies, Inc. has approximately 50.5 million issued and outstanding shares of common stock.

28.     A summary chart depicting the Debtors' current corporate structure is attached hereto as **Exhibit A** (the "Organizational Chart").   As reflected in the Organizational Chart, NanoString Technologies, Inc. wholly owns Debtor NanoString Technologies International, Inc. and two foreign subsidiaries that are not Debtors in these Chapter 11 Cases, NanoString Technologies Europe Limited and Nanostring Technologies SAS.   NanoString Technologies

International, Inc., in turn, wholly owns Debtors NanoString Netherlands B.V. and NanoString Technologies German GmbH as well as the remaining non-debtor foreign subsidiaries: NanoString Technologies Spain, S.L.; NanoString Technologies (Beijing) Co. Ltd.; NanoString Technologies; NanoString Technologies Singapore Pte Limited; and NanoString Technologies Asia Pacific Limited (Hong Kong) (collectively with NanoString Technologies Europe Limited and Nanostring Technologies SAS, the "Non-Debtor Foreign Subsidiaries").  NanoString's foreign subsidiaries do not hold material assets.

## II.    The Debtors' Prepetition Capital Structure

### A.    Prepetition Funded Debt Obligations

29.    As of the Petition Date, the Debtors have an aggregate amount of approximately $281 million in prepetition debt, consisting of approximately $231 million principal amount of outstanding funded debt obligations arising under (i) the Prepetition 2026 Secured Notes and (ii) the Prepetition 2025 Notes, and approximately $50 million in additional unsecured obligations, including, among other things, litigation claims and ordinary course trade claims.  The Debtors' outstanding obligations are set forth below:

| Type of Debt | Maturity | Principal Amount Outstanding |
|---|---|---|
| **Prepetition 2026 Secured Notes** | September 1, 2026 | $217,300,000 |
| **Prepetition 2025 Notes** | March 1, 2025 | $14,276,000 |
| **General Unsecured Claims** | N/A | Approximately $50,000,000 |
| | **Total:** | Approximately $281,576,000 |

30.    **Prepetition 2026 Secured Notes.** Debtor NanoString Technologies, Inc., as issuer, the Guarantors (as defined in the 2026 Indenture) under the 2026 Indenture (as defined below),

U.S. Bank Trust Company, National Association, as trustee and collateral agent (the "Prepetition Trustee and Collateral Agent"), in each case for the benefit of the "Holders" (as defined in the 2026 Indenture) (such Holders, collectively with the Prepetition Trustee and Collateral Agent, the "Prepetition 2026 Secured Noteholders") are party to that certain Indenture, dated as of November 7, 2023 (as amended, restated, supplemented, waived, or otherwise modified as of the date hereof, the "2026 Indenture," and collectively with any other agreements and documents executed or delivered in connection therewith, and each such document as amended, restated, supplemented, waived, or otherwise modified as of the date hereof, the "Prepetition 2026 Notes Documents," and all Obligations (as defined in the Prepetition Notes Documents), the "Prepetition 2026 Notes Obligations").  Under the 2026 Indenture, the Debtors authorized the issuance of their 6.95% Notes in an initial aggregate principal amount of $215,724,000 (the "Prepetition 2026 Secured Notes") and Warrants (as defined in the Prepetition Notes Documents) to purchase 16,000,000 shares of the Debtors' common stock, $0.0001 par value per share.  In connection with the 2026 Indenture, Debtor NanoString Technologies, Inc. and the Prepetition 2026 Secured Noteholders entered into that certain Exchange Agreement, dated as November 6, 2023 (the "Exchange Agreement"), whereby the Prepetition 2026 Secured Noteholders exchanged their Prepetition 2025 Notes (as defined below) for the Prepetition 2026 Secured Notes.  The Exchange Agreement gave the Debtors a paid-in-kind interest feature and a maturity date a year later than the Prepetition 2025 Notes.  As consideration for giving this value to the Debtors, the parties to the Exchange Agreement received a stepped up interest rate and a first-lien on the Debtors' assets.

31.     **Prepetition 2025 Notes.**  Debtor NanoString Technologies, Inc. is also party to that certain Indenture, dated as of March 9, 2020 (as amended, restated, supplemented, waived, or otherwise modified as of the date hereof, the "2020 Indenture,"), by and between Debtor and U.S.

Bank Trust Company, National Association, as successor in interest to U.S. Bank National Association as trustee (the "Prepetition 2025 Note Trustee"), in each case for the benefit of the "Holders" (as defined in the 2020 Indenture) (such Holders, collectively with the Prepetition 2025 Note Trustee, the "Prepetition 2025 Noteholders"), pursuant to which the Debtors authorized the issuance of their 2.625% Convertible Senior Notes in an initial aggregate principal amount of $230,000,000.00 (the "Prepetition 2025 Notes").  The maturity date of the Prepetition 2025 Notes is March 1, 2025.  As set forth above, under the Exchange Agreement, in November 2023, holders of the majority of Prepetition 2025 Notes exchanged their Prepetition 2025 Notes and received Prepetition 2026 Secured Notes and Warrants.  As a result, as of the Petition Date, only approximately $14 million of principal remains outstanding under the Prepetition 2025 Notes, plus accrued and unpaid interest.

32.    **Other Unsecured Claims.**    The Debtors also have other unsecured claims outstanding as of the Petition Date, including judgments arising from litigation (explained in further detail below) and ordinary course trade claims.  The Debtors estimate these unsecured claims total approximately $50 million.

III.    **Events Leading to the Commencement of these Chapter 11 Cases**

A.    **Material Litigation and Related Losses**

33.    The Debtors operate in the intensely competitive biotechnology industry, where they compete with established and early-stage life sciences research companies.  The Debtors differentiate themselves from their competitors by developing complex instruments and by inventing alternative approaches to measuring and viewing genomic information.  Patent litigation is common in this field.  It is often initiated by competitors, and sometimes for the purpose of eliminating competition unfairly, as well as non-operating companies who acquire patents solely for the purpose of litigating for financial gain.  Many manufacturers of research tools face these

disputes in the ordinary course of business, and they are often resolved through licensing arrangements that provide reasonable financial consideration to the patent holder.

34.     A propos of this, the Debtors are currently the subject of an extensive, anti-competitive, multi-jurisdictional litigation campaign by 10x Genomics, Inc. ("10x"), a much larger company than NanoString and one of its primary competitors.  10x has rejected the Debtors' offers to discuss the type of licensing resolution that parties in these disputes often negotiate and in certain cases where 10x (and its licensor) promised to engage in licensing.  Instead, since May 2021, 10x has brought and maintained multiple patent infringement lawsuits against the Debtors in the United States and the European Union with respect to GeoMx and CosMx.  These lawsuits against NanoString are just one part of an extraordinary and unfair effort that 10x is conducting against numerous life sciences companies with the apparent goal of controlling competition to the detriment of the public good.  Indeed, the Debtors are aware of at least three other competitors whom 10x has recently sued on account of purported patent infringement.  In April 2022, 10x sued Parse Bioscience Inc. over patents concerning genetic information analysis.  Then, in June 2022, 10x sued Vizgen, Inc. over purported violations of its "single-cell spatial transcriptomics" platform.  Most recently, in December 2023, 10x sued Curio Bioscience over allegations that Curio infringed its patents related to barcode sequences used to track and analyze genes from tissue samples.

35.     NanoString has worked tirelessly to defend its technologies and firmly rejects 10x's attempts to unfairly utilize litigation to gain an upper hand in business.  The Debtors have strong legal defenses and counterclaims, and are confident in the long-term success and availability of their products.  Nonetheless, the Debtors have recently faced unfavorable rulings in some of these

cases that have created significant pressure on their business.  10x's pending litigation against the Debtors is described in further detail below.

36.     **GeoMx Litigation.**  The patents that are the subject of 10x's GeoMx litigation are the property of Prognosys Biosciences, Inc. ("Prognosys"), a defunct company that never manufactured spatial biology products, from which 10x acquired an exclusive license.  On May 6, 2021, 10x and Prognosys filed a complaint[2] against NanoString Technologies, Inc. in the United States District Court for the District of Delaware (the "Delaware District Court"), alleging that certain products, services and components sold by the Debtors for use in connection with GeoMx (the "Identified GeoMx Products") infringe seven patents that are owned by Prognosys.  The complaint sought, among other relief, injunctive relief and unspecified damages (including treble damages and attorneys' fees) in relation to the Debtors' making, using, selling, offering to sell, exporting and/or importing in the United States the Identified GeoMx Products, as well as the alleged infringement by others of the asserted Prognosys patents through their use of the Identified GeoMx Products.

37.     From November 13 through November 17, 2023, the Delaware District Court held a jury trial on these issues.  On November 17, 2023, the jury rendered a verdict against the Debtors, finding that the Debtors willfully infringed the asserted Prognosys patents, and awarded 10x and Prognosys approximately $31.6 million in damages, consisting of approximately $25.6 million of lost profits and a $6 million royalty.  On January 17, 2024, NanoString filed post-trial motions requesting, among other things, that the Delaware District Court (i) allow the action to be stayed pending appeal without the need to post a bond, (ii) not award enhanced or supplemental damages,

---

[2]     10x and Prognosys filed an amended complaint on May 19, 2021, and a second amended complaint on May 4, 2022.

(iii) not award an ongoing royalty, and (iv) not enter an injunction against NanoString with respect to the Identified GeoMx Products.  These motions have not been heard and are stayed.

38.      The jury's damages award was unusually large for this case, and its magnitude—particularly the lost profits award—exceeded what the Debtors expected a jury to award  in the case of an adverse ruling.  As explained further herein, the size of the jury's damages award has put significant pressure on NanoString's short-term liquidity.  The unexpected financial impact of this verdict is a key reason the Debtors have filed these Chapter 11 Cases despite their confidence that, but for the automatic stay, NanoString's liability would be erased on appeal.

39.      **U.S. CosMx Litigation.**  The patents that are the subject of 10x's CosMx litigation arose out of the laboratory of Dr. George Church, a professor at Harvard University ("Harvard"). Dr. Church's research leading to the patents was funded through a $19 million grant from the National Institutes of Health ("NIH"), which is a part of the United States Department of Health and Human Services and the federal government's primary agency responsible for biomedical and public health research.  In their grant application, Harvard and Dr. Church committed to, among other things, provide broad scientific and market access to the technology and inventions that would be developed using the grant funds.  The NIH then awarded the grant with the explicit condition that Harvard comply with its commitments in the grant application in this regard. Nonetheless, Harvard (and now with 10x) did not make the technology available through open, non-exclusive licensing agreements, as it promised.  Instead, Harvard exclusively licensed the patents embodying the inventions developed with the NIH grant funds to ReadCoor, Inc., a company co-founded by Dr. Church and subsequently acquired by 10x in late 2020.  10x used the patented technology to develop a spatial imaging platform called the Xenium In Situ platform, which analyzes gene expression in single cells.

40.     On February 28, 2022, 10x and Harvard filed a complaint[3] against NanoString

Technologies, Inc. in the Delaware District Court, alleging that certain products, services, and

components sold by the Debtors for use in connection with CosMx (the "Identified CosMx

Products") infringe six patents owned by Harvard and 10x.  The complaint seeks, among other

relief, injunctive relief and unspecified damages (including attorneys' fees) in relation to the

Debtors' making, using, selling, offering to sell, exporting and/or importing in the United States

the Identified CosMx Products.  The Debtors contest the purported infringement on several

different grounds and have sought to invalidate 10x's patents.  On July 10, 2023, the Delaware

District Court granted the Company's motion to amend its answer to add counterclaims against

10x and Harvard for antitrust and unfair competition violations, as well as the affirmative defense

of "unclean hands" by 10x and Harvard, each relating to the Company's claim that Harvard made

a non-exclusive licensing commitment in order to secure grant funding from the NIH for the

research that led to the patents at issue in the litigation.  The parties have been engaged in discovery

on all claims and counterclaims in this case.  Absent the automatic stay, trial on these issues is

scheduled to begin in September 2024.

41.     **European CosMx Litigation.**  On May 9, 2022, the Company was notified of a

complaint filed by 10x in the Munich Regional Court I (the "Munich Regional Court") in Germany,

dated March 4, 2022.  The complaint named NanoString Technologies, Inc. and its wholly-owned

subsidiary, NanoString Technologies Germany GmbH, and alleged that CosMx and associated

products and services infringe a European patent that is owned by Harvard. The complaint seeks,

among other relief, injunctive relief and damages in relation to the Debtors' selling and offering

to sell CosMx and associated products and services in Germany.  On May 17, 2023, the Munich

---

[3]     10x and Harvard filed an amended complaint on May 12, 2022, and a second amended complaint on March 1,
2023.

Regional Court found that the CosMx system, when used to detect RNA targets, infringes the subject patent. The Munich Regional Court granted 10x and Harvard the right to enforce an injunction against the sale and use of the CosMx instrument for RNA detection and certain related products in Germany.  The Company is currently appealing this decision, which is limited solely to Germany and does not apply to the use of CosMx for the detection of proteins.  In connection with the appeal, the Company requested a stay of injunction while the appeal is pending.  On December 20, 2023, the Munich Higher Regional Court granted this stay of the injunction in Germany, citing an incomplete examination by the lower court of the Company's non-infringement contentions.  The stay of the injunction is subject to the Company's posting of a bond.

42.     Similarly, on June 1, 2023, 10x and Harvard filed suits against the Company in the European Unified Patent Court ("UPC"), alleging that the use and distribution of the Company's CosMx products for RNA detection infringe two patents owned by Harvard.  The Company filed oppositions challenging the validity of those patents.  On September 19, 2023, the UPC granted a preliminary injunction in favor of 10x and Harvard with respect to one of those patents, enjoining use of CosMx for RNA detection in the 17 member countries of the UPC while the case awaits a full hearing on the merits.  The Company appealed the preliminary injunction with respect to this patent, which the UPC Court of Appeal in Luxembourg heard on December 18, 2023.  A decision is currently pending.  With respect to the other patent at issue in this litigation, the UPC denied 10x's request for a preliminary injunction on October 10, 2023.  10x has also filed "main requests" with the UPC (meaning requests for full hearings on the merits, rather than preliminary relief),

alleging that utilizing CosMx for RNA detection infringes the two patents.  Dates for these hearings have not yet been set.

43.     As a result of the difficulties caused by this prepetition litigation, the Debtors retained PWP in November 2023 to begin marketing their businesses.  Prior to filing the petition, the Debtors received multiple non-binding bids to purchase their whole business, and multiple non-binding bids to purchase their nCounter business.  Importantly, these chapter 11 cases will provide, among other things, the breathing room and additional liquidity necessary to identify a "stalking horse" bidder and pursue a value-maximizing sale transaction.

### B.    Liquidity Situation and Operational Restructuring Efforts

44.     Although the Debtors' total revenues grew in 2023, totaling approximately $128 million for the nine months ended September 2023, compared to approximately $92.8 million for the nine months ended September 2022, the Debtors have not recognized any net profit since their inception.  It is typical for companies in the life sciences industry not to reach profitability until they generate several hundred million dollars in revenue, with companies raising money from outside investors or reinvesting money generated by the business to invest in new product development and commercial activities.  Much of the cash that NanoString and similar companies earn from product sales or raise from investors prior to reaching greater revenue scale is reinvested into creating and selling new products.  During this early stage, and in particular during the launch of their spatial biology products, large amounts invested in research and development and new product commercialization have led the Debtors to incur operating losses, although they have historically been able to pay debts as they have come due.  For the nine months ended September 2023, the Debtors had net losses of approximately $122.3 million; in the prior year, for the nine months ended September 2022, the Debtors had net losses of approximately $115.4 million.

45. In or around March 2023, the Company began to explore the market for potential financing and refinancing alternatives, given its continued need to invest in its business and products and the maturity date of the Prepetition 2025 Notes. The Company at that time began engaging with its existing noteholders to provide additional capital, which unfortunately did not result in any actionable proposal at the time. Subsequent to these initial discussions, the Company worked with PWP and other advisors to canvass the market for potential out-of-court transactions that would raise new debt capital that could repay the Prepetition 2025 Notes, offer extended maturity of its debt obligations and that would potentially provide additional capital resources to invest in the business. While the Company secured received some level of interest, these refinancing efforts were ultimately unsuccessful.

46. In October 2023, NanoString announced an operational reorganization designed to improve the Company's financial profile and accelerate its path to profitability. The reorganization primarily involved the Debtors' research and development and manufacturing departments and activities. As part of the reorganization, the Debtors effectuated a reduction in force of approximately 95 employees and engaged in cost-cutting measures that together were intended to reduce expenses by over $15 million per year. Together with these actions, given the loss of other available financing opportunities with the impact of the Unified Patent Court ruling, the Company re-engaged in discussions with certain existing holders of the Prepetition 2025 Notes, with the objectives of extending the maturity of that debt and raising new capital for the Company to invest in and support its business. In early November 2023, pursuant to the terms of the Exchange Agreement and the 2026 Indenture, the Company extended the maturity date of its funded debt by 18 months and expected to make interest payments in kind for the period ending December 31, 2024.

47.     After the Exchange Agreement, in late 2023, the unexpected $31.6 million damages award stemming from the jury verdict in the GeoMx litigation, absent reversal, has worsened the company's financial condition.   In light of the unexpected pressure the verdict placed on their liquidity, the Debtors moved to proactively cut costs again: in January 2024, the Debtors effectuated a second reduction in force which resulted in the elimination of approximately 100 positions (bringing their overall workforce reduction to 25% over the past six months), which together with other initiatives is anticipated to reduce expenses by another $15 million.  Further contributing to the Company's troubles is that 10x is threatening litigation against customers if those customers continue to transact with NanoString, negatively impacting the Company's revenue and cash collections.

48.     Notwithstanding their increasing revenues and their repeated and proactive efforts to reduce their costs, the Debtors are now facing an imminent liquidity crisis.  The Debtors will experience a cash shortfall as soon as this month, caused in significant part by the multiple lawsuits 10x has filed against them and the significant and ongoing costs of defending against such claims, and the draconian award imposed by the jury in the GeoMx Litigation.  As a result of this liquidity crisis and the initial litigation outcomes, the Debtors have experienced a precipitous drop in their stock price: NanoString's stock was trading at $0.47 per share immediately prior to the Petition Date, when it was over $10 per share a year ago and over $80 per share in 2021.  On January 4, 2024, NanoString received written notice from Nasdaq that, for the last 30 consecutive business days, the bid price for NanoString's common stock has closed below the $1.00 per share price requirement for continued inclusion on the Nasdaq Global Market.

### C.     Out-of-Court Restructuring Efforts

49.     In November 2023, with the assistance of PWP, the Debtors commenced a robust marketing process to explore alternatives, including a potential sale, of their business or assets.  To

facilitate this process, the Debtors and PWP, among other things, prepared marketing materials and established an electronic data room to provide potential bidders with the information necessary to make a proposal.  During this prepetition marketing process, PWP reached out to over 55 potential bidders, of which 28 signed confidentiality agreements and were granted access to the data room.  The process was timed to culminate at a prominent healthcare conference in January 2024.  The Debtors have received multiple initial bids from potentially interested parties, and PWP informed each of these parties that an expeditious transaction would be necessary due to the Debtors' liquidity situation.  Although it was not feasible to transact quickly enough with any one of these bidders to avoid these Chapter 11 Cases, constructive discussions remain ongoing with all of them.  The Debtors anticipate consummating one or more sale transactions through a court-supervised auction in these Chapter 11 Cases—either with one or more of these bidders, or other bidders that come forward in the auction process.

50.     With such concerns in mind, and with their operating cash running low, the Debtors have worked with the Restructuring Advisors over the last several weeks to assist with contingency planning and advise on strategic alternatives, including a sale of substantially all of the company's assets in chapter 11.  The Debtors implemented a retention bonus program for 45 key executives and employees totaling approximately $10 million to ensure that the members of the Debtors' workforce who are critical to consummating a comprehensive restructuring are property incentivized and motivated to remain employed by the Debtors at this critical juncture.  The Company also engaged extensively with the 2026 Prepetition Noteholders, ultimately resulting in the DIP Facility described below.

IV.     **The Proposed Debtor-in-Possession Financing**

51.     Although the Debtors were unable to identify a path forward with their existing lenders outside of court, after rigorous, and, at times, contentious, negotiations, the Prepetition

2026 Secured Noteholders have agreed to provide a debtor-in-possession financing facility, as well as consensual access to prepetition cash collateral, to give the Debtors access to the liquidity to smoothly land into these Chapter 11 Cases and fund a value-maximizing sale process.  The DIP Facility totals $47.5 million in new money financing for the Debtors.  It will provide cash to administer these Chapter 11 Cases, fund the business, pay vendors in the ordinary course, and ensure that wages, taxes, and other obligations are paid.  Specifically, the DIP permits the Debtors to retain at least $40 million in aggregate proceeds from any sale that does not constitute a sale of all equity interests in the Debtors or all or substantially all of the Debtors' assets, ensuring that, if the highest and best option is to sell the Debtors' nCounter and spatial businesses separately, the Debtors will have sufficient funds to continue operating the balance of the Company in the ordinary course with the goal of identifying a buyer for those assets.  The DIP Facility is the best available financing under the circumstances, and it is critical for the Debtors to complete their strategy of a sale of substantially all of their assets.

52.    Pursuant to the DIP Motion (as defined below), the Debtors also seek the continued use of the Prepetition 2026 Secured Noteholders' cash collateral to provide sufficient liquidity for their operations during these Chapter 11 Cases.  Without access to cash collateral, the Debtors would be unable to operate their business and, as a result, their stakeholders would be immediately and irreparably harmed.  Authorization to use cash collateral throughout the duration of these Chapter 11 Cases, in conjunction with the DIP Facility, will provide the Debtors with sufficient liquidity to continue operating as a going-concern as well as maintain relationships with key vendors and personnel, continue to provide services to their customers, and pay wages to employees.

53.     In consideration for the consensual use of Cash Collateral, the Debtors have agreed to provide the Prepetition 2026 Secured Noteholders with adequate protection as set forth in the DIP Motion and the accompanying proposed orders.  The Debtors' use of Cash Collateral will be subject to the same milestones agreed upon in the DIP Facility.

## V.    Evidence in Support of First Day Pleadings[4]

54.     In my capacity as President and Chief Executive Officer, I believe that the relief requested in the First Day Pleadings is necessary and essential to ensuring that the Debtors' immediate needs are met and that the Debtors (and other constituencies) will not suffer any immediate and irreparable harm as a result of the commencement of these Chapter 11 Cases.  My opinion as to the necessity of the First Day Pleadings is based upon my firsthand experience as President and Chief Executive Officer and my review of various materials and information provided to me by the Debtors' senior management and the Debtors' advisors, as well as discussions had in connection therewith.  In considering the necessary first-day relief, the Debtors' senior management, the Restructuring Advisors, and I were cognizant of the level of cash on hand and the limitations imposed by the budget governing the DIP Facility and the Debtors' use of cash collateral.  The Debtors have only requested the relief necessary to preserve the value of the Company's assets during the pendency of these chapter 11 proceedings.

### A.    Motions Related to Case Management

#### i.    Debtors' Motion for an Order Authorizing the Joint Administration of the Debtors' Chapter 11 Cases

55.     The Debtors seek the joint administration of their Chapter 11 Cases for procedural purposes only.  Many of the motions, hearings, and other matters involved in these Chapter 11

---

[4]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the applicable First Day Pleading.

Cases will affect all of the Debtors and, given the nature of the Debtors' operations, the treatment of certain contracts and business relationships of a single Debtor may impact the assets and operations of other Debtors. I understand that joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative hearings, notices, applications, and orders. I understand that no prejudice will befall any party by the joint administration of the Debtors' cases, as the relief sought is solely procedural and is not intended to affect substantive rights. Based on the foregoing, I believe that it would be far more efficient for the administration of these Chapter 11 Cases if the Court were to authorize their joint administration.

        **ii.**    **Debtors' Motion for Entry of an Order (I) Waiving the Requirements to File a List of, and Provide Notice to, All Equity Holders, (II) Authorizing Redaction of Certain Personal Identification Information from the Creditor Matrix and Other Documents, and (III) Granting Related Relief**

56.     The Debtors request (i) a waiver of the requirement to file a list of, and provide notice to, all equity security holders, and (ii) authority to redact certain personal identification information in the consolidated list of creditors (the "Creditor Matrix"), the Debtors' schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements"), and other documents.

57.     As of the Petition Date, Debtor NanoString Technologies, Inc. had one class of common stock outstanding to hundreds of equity holders. As an initial matter, NanoString Technologies, Inc. is a publicly-traded company with actively trading stock. NanoString Technologies, Inc. does not maintain an equity list and, therefore, must obtain the names and addresses of its shareholders from a securities agent. Further, the holders of such equity change constantly. As such, NanoString Technologies, Inc. would have to undertake an investigation and diligence to confirm the current list of the names and addresses of its equity security holders. I believe that preparing a list of equity holders with accurate names and last known addresses and

providing notices to all such parties of the commencement of these Chapter 11 Cases would create a significant expense and administrative burden without a corresponding benefit to the estates or parties in interest.

58.    I also believe the Court should authorize the Debtors to redact personal identification information of individuals from filings in these Chapter 11 Cases, including the Debtors' customers, equity holders, and employees, because, among other reasons, such information could be used to perpetrate identity theft or stalking.  With potentially hundreds of individual creditors, the Debtors cannot reasonably know with sufficient certainty whether a release of such individual creditors' and interest holders' personal information could potentially jeopardize their safety.

      iii.    **Debtors' Motion for Entry of Order (I) Restating and Enforcing Protections of 11 U.S.C. §§ 362, 365, 525, and 541(c) and (II) Granting Related Relief**

59.    To aid in the administration of these Chapter 11 Cases, the Debtors are seeking an order that confirms the application of four key protections provided by the Bankruptcy Code, which I understand to be: (i) the automatic stay provisions of section 362; (ii) the *ipso facto* provisions of section 365; (iii) the anti-discrimination provisions of section 525; and (iv) the provisions of section 541 of the Bankruptcy Code regarding property of the estate.  Because of the global nature of the Debtors' business and their dealings with non-U.S. creditors, who may be unfamiliar with the protections afforded to chapter 11 debtors under the Bankruptcy Code, the Debtors are requesting an order implementing these protections be entered by this Court.

60.    The Debtors operate in numerous countries across the world with different legal systems, including, but not limited to, Canada, Germany, the Netherlands, the United Kingdom, Spain, France, China, Singapore, Japan, India, and Australia.  Many of these non-U.S. creditors affected by sections 362, 365, 525, and 541(c) of the Bankruptcy Code may not be aware of the

significant and necessary protections these sections provide to the Debtors.    Further, the "automatic" and self-executing nature of these protections may not be recognized promptly by foreign creditors or tribunals, unless embodied in an order of this Court.    Accordingly, the Debtors respectfully request that the Court enter an order that restates the applicable provisions of sections of the Bankruptcy Code.    Such an order, which the Debtors will be able to transmit to affected parties, will maximize the protections afforded by such sections of the Bankruptcy Code.

61.    In addition, to alleviate the confusion that may arise concerning certain of the foreign non-Debtor affiliates, the Debtors seek approval from this Court of a notice to the customers, suppliers, and other stakeholders confirming that (i) only two foreign affiliates, NanoString Technologies Netherlands B.V. and NanoString Technologies Germany GmbH, are Debtors in these Chapter 11 Cases, and (ii) the remaining non-Debtor foreign affiliates are not included in these Chapter 11 Cases and are not subject to (a) the supervision of this Court or (b) the provisions of the Bankruptcy Code, unless otherwise requested through an order of the Court. Accordingly, the Debtors respectfully request that this Court enter an order approving the form of notice attached to the motion.

62.    Absent the relief requested, I believe the Debtors' ability to operate seamlessly in multiple jurisdictions may be impaired to the detriment of their estates, creditors, and all parties in interest.    For at least the foregoing reasons, I believe that the relief is in the best interests of the Debtors, their estates, and creditors.

> iv.    **Debtors' Motion for Interim and Final Orders Establishing Notice and Hearing Procedures for Trading in and Declarations of Worthlessness with Respect to Equity Securities in NanoString Technologies, Inc. (the "NOL Motion")**

63.    Through the NOL Motion, the Debtors seek to establish procedures to protect the potential value of the Debtors' federal tax net operating loss carryforwards ("NOLs" and, together

with certain other tax attributes, the "Tax Attributes") for use during the pendency of these Chapter 11 Cases. These procedures will apply to (i) common stock (the "Common Stock") of NanoString Technologies, Inc., and options, warrants, or similar rights (within the meaning of applicable treasury regulations) to acquire Common Stock and (ii) any claim (for income tax reporting purposes) of a worthless stock deduction under section 165(g) of the Internal Revenue Code of 1986, as amended with respect to Common Stock (a "Worthless Stock Deduction") by a majority shareholder.

64.     The NOL Motion seeks authority to restrict trading of Common Stock and any claim of a Worthless Stock Deduction that could result in an ownership change occurring before the effective date of a chapter 11 plan or any applicable bankruptcy court order. Such a restriction would protect the Debtors' ability to preserve the Tax Attributes during the pendency of these Chapter 11 Cases. The termination or limitation of the Tax Attributes could be materially detrimental to all parties in interest.

65.     I believe that the relief requested in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their business in chapter 11.

### v.     Debtors' Application for Entry of an Order Appointing Kroll Restructuring Administration LLC as Claims and Noticing Agent

66.     The Debtors filed an application to retain Kroll Restructuring Administration LLC ("Kroll") as their Court's claims and noticing agent for these Chapter 11 Cases. I believe that the retention of Kroll is critical because of the large number of creditors identified in these cases.

67.     I understand that Kroll is a data-processing firm with extensive experience in noticing, claims processing, and other administrative tasks in chapter 11 cases. The Debtors obtained and reviewed engagement proposals from at least two (2) other Court-approved claims

and noticing agents to ensure selection through a competitive process.  I believe that Kroll's rates

are competitive and reasonable given Kroll's quality of services and expertise.  Given the need for

the services described above and Kroll's expertise in providing such services, I believe that

retaining Kroll will expedite service of notices, streamline the claims administration process, and

permit the Debtors to focus on their Chapter 11 efforts.

68.     The Debtors also intend to file a separate application to retain Kroll as

administrative agent to provide, among other things, certain solicitation-related services.

**B.     Motions Related to Operations**

**i.     Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Maintain their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Continue to Perform Intercompany Transactions; (II) Waiving Certain Operating Guidelines; (III) Suspending Time to Comply with Section 345(b) of the Bankruptcy Code; and (IV) Granting Related Relief**

69.     In the ordinary course of business, the Debtors utilize and maintain a cash

management system (the "Cash Management System") that includes operating, collection, and

disbursement accounts.   The Cash Management System is integral to the operation and

administration of the Debtors' business, including the business of their Non-Debtor Foreign

Affiliates.  The Cash Management System allows the Debtors to efficiently collect, transfer, and

disburse funds generated through the Debtors' operations and to accurately record such collections,

transfers, and disbursements as they are made.  To support their operations, the Debtors maintain

a total of eleven bank accounts across seven different banks: PNC Bank, Silicon Valley Bank,

HSBC Bank, KBC Bank, Shanghai Pudong Development Bank, WISE, and Banco Santander

(Spain) (collectively, the "Banks").  The Bank Accounts include one (1) main operating account

at PNC Bank; one (1) main operating account at Silicon Valley Bank; one (1) zero-balance

collections account at Silicon Valley Bank; one (1) international collections account at Silicon

Valley Bank; five (5) foreign Bank Accounts located at WISE, HSBC Bank, KBC Bank, and Banco Santander (Spain); one (1) savings account at PNC Bank; and one (1) zero-balance multi-currency account at Silicon Valley Bank.

70.     Moreover, in the ordinary course of business, the Debtors engage in routine intercompany transactions between and among themselves and with their Non-Debtor Foreign Affiliates (the "Intercompany Transactions") related to, among other things, intercompany funding, which may result in intercompany receivables and payables owing between the Debtors and the Debtors and their Non-Debtor Foreign Affiliates.  The Debtors generally account for and record all Intercompany Transactions and Intercompany Claims in their centralized accounting system, the results of which are concurrently recorded on the Debtors' balance sheets and regularly reconciled.  The Non-Debtor Foreign Affiliates do not generate money through sales and thus rely on the U.S.-based Debtors to pay their costs.  As a result, the Intercompany Transactions are essential to the Debtors' foreign business operations and are consistent with past practices by and amongst the Debtors and their Non-Debtor Foreign Affiliates.  The Cash Management System enables the Debtors to pay their financial obligations, centrally control and monitor corporate funds and available cash, reduce administrative overhead expenses, and record accurate financial data.

71.     The Debtors are requesting authorization to maintain their existing Cash Management System.  I believe that the Debtors' existing cash management and intercompany accounting procedures are essential to the orderly operation of the Debtors' business.  Any material interruption in the Debtors' existing Cash Management System could cause immediate and irreparable harm and confusion, disrupt payroll, introduce inefficiency into the Debtors' operations when efficiency is most essential, and strain the Debtors' relationships with critical third parties,

each of which could potentially negatively impact creditor recoveries in these Chapter 11 Cases. Moreover, it is my understanding that all but one of the Debtors' Bank Accounts are authorized depositories under the U.S. Trustee's *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines") or insured by the Federal Deposit Insurance Corporation or the equivalent governmental agency in the country where the account is located.

72.     Finally, it is also my understanding that the U.S. Trustee Guidelines require chapter 11 debtors to utilize new checks bearing the designation "Debtor in Possession" and the case number for the debtor in possession accounts. The Debtors request authority to continue using their existing business forms without interference to their status as debtors in possession until such forms are depleted, at which time the Debtors intend to begin stamping or printing their business forms with "Debtor in Possession" and the chapter 11 case numbers under which these cases are being administered.

73.     I believe that allowing the Debtors to maintain their Cash Management System, continue Intercompany Transactions, continue to use their customary business forms, and suspend certain requirements under section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines would be in the best interests of the Debtors' estates, creditors, and other parties in interest.

ii.     **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Certain Prepetition Employment Obligations and (B) Maintain Employee Benefits Programs and (II) Granting Related Relief (the "Wage Motion")**

74.     The Debtors have filed a motion seeking authority to, among other things, (i) pay all prepetition wages, salaries, and compensation (the "Wages") to their Workforce, payments owed to non-insiders under historical bonus programs and severance practices, and all related administrative and incidental costs (each as described below and, collectively, the "Compensation

<u>Obligations</u>"), and prepetition employee benefits (each as described below and, collectively, the "<u>Employee Benefit Obligations</u>"); (ii) pay all employment, unemployment, Social Security, Medicare, and federal, state, and local taxes relating to the Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtors to governmental authorities (collectively, "<u>Payroll Taxes</u>"), and make other payroll deductions, including, but not limited to, retirement, pension, and other employee benefit plan contributions and voluntary deductions (all as described below and, collectively with the Payroll Taxes, the "<u>Payroll Deduction Obligations</u>" and, collectively with the Wages and Employee Benefit Obligations, the "<u>Prepetition Workforce Obligations</u>"); and (iii) honor and continue the Debtors' prepetition programs, policies, and practices as described in this Motion in the ordinary course of business

75.    Moreover, the Debtors have established a portfolio of Employee benefit plans, programs, and policies, including: medical coverage, dental coverage, vision coverage, life and disability insurance, a flexible spending account, a health savings account, unemployment insurance, a 401(k) plan, and other ancillary welfare programs for their Employees.  The Debtors seek authority to pay prepetition obligations relating to these policies, and to continue these policies postpetition.

76.    Further, in the ordinary course of business, the Debtors maintain a commercial incentive compensation plan for certain Employees and Contract Workers in sales and sales support roles (the "<u>Commission Program</u>").  The Commission Program is designed to incent and reward high achievement of the Debtors' product and services sales relative to an assigned quota. Employees and Contract Workers working in a sales and sales support position are eligible to earn

commission on a quarterly basis by meeting certain revenue targets established by the Debtors. Approximately 161 Employees and Contract Workers participate in the Commission Program.

77.    Additionally, the Debtors have historically maintained an annual bonus program for Employees that are not eligible to receive commission (the "Bonus Program").  The Bonus Program is discretionary, calculated as a percentage of the Employee's salary, and dependent upon the Employee's performance as well as the Debtors' performance.  The Debtors are current on all payments under the Bonus Program and do not expect to make any payments under the Bonus Program until 2025.

78.    Finally, in the ordinary course of business, while the Debtors do not have a formal severance policy, the Debtors have an informal, established historical practice of paying severance to both United States and international Employees (the "Severance Practices").  Prior to the Petition Date, the Debtors completed a reduction in force, pursuant to which they paid severance obligations to terminated Employees.  The Debtors are not seeking authority to pay prepetition outstanding obligations owed in connection with their Severance Practices.  Instead, the Debtors are seeking authority, but not direction, to continue the Severance Practices in the ordinary course of business.  Although payments under the Severance Practices are not due and payable until an Employee is terminated and at the sole discretion of the Debtors, having the Severance Practices in place will assuage Employees and motivate them to continue working for the Debtors.  The Debtors want to assure their Employees that they will be compensated fairly and appropriately in the event that the ultimate purchaser of the Debtors' assets reorganizes the company's internal operations upon emergence from chapter 11.

79.    The requested authority to continue to pay the Prepetition Workforce Obligations and to maintain the Debtors' current employee benefits programs is critical to ensure that the

Debtors can retain personnel knowledgeable about the Debtors' business, the Debtors' employees continue to provide quality services to the Debtors at a time when they are needed most, and the Debtors remain competitive with comparable employers.

80.     The proposed interim and final orders, if entered, will grant the Debtors the authority to pay their Workforce obligations in accordance with the Debtors' prepetition practices; provided, however, that no single individual shall be entitled to receive more than $15,150 on account of prepetition obligations, except to the extent required under applicable state law.  The Debtors' ability to continue operations and maximize value depends, in large part, on the retention, motivation, and productivity of their workforce, whose efforts will be critical to the success of these Chapter 11 Cases.  To provide certainty to the Debtors' Workforce, maintain morale and productivity, limit turnover, and minimize any adverse effect of the commencement of these Chapter 11 Cases, I believe it is necessary to continue providing ordinary course compensation and benefits to the Workforce.  The total amount to be paid if the relief sought in the motion is granted is modest compared with the size of the Debtors' estates and the importance of the employees to the Debtors' sale process.

81.     I believe that authorizing the Debtors to pay these Prepetition Workforce Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors, their creditors, and all parties in interest, and will enable the Debtors to continue to operate their business without disruption in an economic and efficient manner.

   iii. **Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Resolving Objections by Utility Companies and Determining Any Additional Adequate Assurance of Payment, and (IV) Granting Related Relief**

82. In connection with the operation of their business and management of their properties, the Debtors historically obtain internet, data, telephone, and other similar services (collectively, the "Utility Services") from a number of utility companies (collectively, the "Utility Companies").  As of the Petition Date, the Debtors' operations take place across numerous locations, including their corporate office leases in Seattle, Washington and their manufacturing facilities located in Bothell, Washington.  These locations require the Utility Services to function. Further, pursuant to certain of the Debtors' lease agreements, certain Utility Services are billed directly to the Debtors' landlords and passed through to the Debtors as part of the Debtors' lease payments.  The Debtors are not seeking relief as to such leases.  Among other things, the Debtors request that the Court:  (a) prohibit the Utility Companies from altering, refusing, or discontinuing the Utility Services on account of non-payment for prepetition services, including the making of demands for security deposits or accelerated payment terms; (b) determine that the Debtors have provided each of the Utility Companies with "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based on the Debtors' establishment of a segregated account in the amount of $32,650, which equals approximately 50% of the Debtors' estimated monthly cost of the Utility Services subsequent to the Petition Date; and (c) establish procedures for determining additional adequate assurance of future payment, if any, and authorizing the Debtors to provide additional adequate assurance of future payment to the Utility Companies.

83. Uninterrupted Utility Services are essential to the Debtors' business operations and the overall success of these Chapter 11 Cases.  Should any Utility Provider refuse or discontinue

service, even for a brief period, the Debtors' business operations could be severely disrupted, causing immediate and irreparable harm. Accordingly, it is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases. I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors and their estates, will not harm unsecured creditors, and may reduce harm and administrative expense to the Debtors' estates.

iv.     **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (II) Authorizing the Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Related Relief**

84.     In the ordinary course of business, the Debtors incur or collect and remit certain taxes, including sales and use, franchise, property taxes, and various other similar taxes, fees, charges, and assessments (the "Taxes and Fees"). The Debtors remit such Taxes and Fees to various foreign, federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies (the "Taxing Authorities"). Payment of the Taxes and Fees is critical to the Debtors' continued, uninterrupted operations. Further, the Debtors' failure to pay the Taxes and Fees may cause the Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the applicable jurisdictions, seeking to lift the automatic stay, and imposing personal liability on the Debtors' officers and directors.

85.     Any regulatory dispute or delinquency that impacts the Debtors' ability to conduct business could have a wide-ranging and adverse effect on the Debtors' operations as a whole, as described further in the motion. I believe that payment of the Taxes and Fees in an amount not to exceed $330,000 upon entry of the Interim Order and $517,000 upon entry of the Final Order is in the best interests of the Debtors and their estates, will not harm unsecured creditors, and may reduce harm and administrative expense to the Debtors' estates.

> v.    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, (II) Authorizing the Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Related Relief**

86.    Prior to the Petition Date, and in the ordinary course of their business, the Debtors sought to maximize the value of their customer relationships and to develop and sustain a positive reputation in the marketplace through the implementation of certain accommodations to their customers (the "Customer Programs").  On account of the Customer Programs, the Debtors may owe certain obligations to their customers arising both before and after the Petition Date (collectively, the "Customer Obligations").   The Debtors' Customer Programs include (i) a Warranty Program, (ii) a Customer Credit Program, and (iii) a Technology Access & User Access Program.

87.    The Customer Programs promote customer satisfaction, create goodwill for the Debtors' business, and enhance the value of their brand.  The Debtors operate in a highly competitive global marketplace, and the Debtors' customers can turn to competitors to pursue their research aims.  The Debtors' failure to either honor their prepetition Customer Obligations or to continue the Customer Programs in the ordinary course during these Chapter 11 Cases will put the Debtors at a significant competitive disadvantage.  The Debtors seek authority to continue the Customer Programs in the ordinary course of business and to pay claims arising out of the Customer Programs to avoid any harm or disruption to their business.  I believe that the continuation of the Customer Programs is critical to the Debtors' ongoing operations in these Chapter 11 Cases and is necessary to maximize the value of the Debtors' business for the benefit of all stakeholders.

vi.   **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Certain Critical Vendors, Foreign Vendors, Shippers & Logistics Providers, and 503(b)(9) Claimants, and (II) Granting Related Relief**

88.   The Debtors' success with their different gene expression and spatial biology businesses is partially fueled by their partnerships with certain critical goods and services providers that ensure that the Debtors are able to produce the highest quality products and platforms for use by their customers in connection with pharmaceutical product development and human clinical trials of potential new therapies.  The Debtors' production and sale of their products depend on the uninterrupted flow of raw materials and products through their supply chain and distribution network.

89.   The Debtors' critical goods and services providers support nearly every aspect of the Debtors' business, including by: storing the Debtors' products, shipping the Debtors' products to their customers, supplying the raw materials and specialized tools required to research, develop, and manufacture their products, and co-manufacturing such products.  If these critical goods and services providers refuse to continue doing business with the Debtors on account of outstanding prepetition amounts, replacing them would cause significant delays in production, which would not only jeopardize the quality of the Debtors' products, but also cause irreparable, and potentially irreversible, damage to the Debtors' business and their estates.  Further, even if the Debtors were able to switch shippers and logistics providers, raw material suppliers, co-manufacturers, and other critical and foreign vendors to alternative suppliers on such short notice (which, with respect to the Critical Vendors, Foreign Vendors, and Shippers & Logistics Providers discussed herein, they cannot), there would be significant disruptions in the Debtors' manufacturing to the detriment of the Debtors' business and, ultimately, their stakeholders.

90.     I believe that the authority to pay the Critical Vendors, Foreign Vendors, Shippers & Logistics Providers, and 503(b)(9) Claimants in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  The relief requested in the motion is necessary to preserve and maximize value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise.

### C.     Motions Related to Financing Process

> i.     **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To Obtain Postpetition Financing, Granting Senior Postpetition Security Interests and According Superpriority Administrative Expense Status Pursuant to Section 364(c) and 364(d) of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief (the "DIP Motion")**

91.     Concurrently herewith, the Debtors filed a motion seeking authority to enter into the DIP Facility, to be provided by the Prepetition 2026 Secured Noteholders.  The DIP Facility would provide the Debtors with total financing of up to $47.5 million in new money term loans, of which $12.5 million will be made available upon entry of the Interim Order, and of which $35.0 million will be made available upon entry of the Final Order, in each case in accordance with the Approved Budget (as defined in the DIP Motion).  The Debtors are in immediate need of financing to continue their operations.  Access to the DIP Facility, coupled with the Debtors' continued use of cash collateral, will provide the necessary liquidity to fund the sale process and the Debtors' operating expenses, working capital, and other needs during these Chapter 11 Cases.  I believe that access to the funds available under the DIP Facility is crucial to avoid immediate and irreparable harm to the Debtors' estates.

92.     The proposed DIP Facility represents the best postpetition financing option available to the Debtors under the circumstances.  Prior to the commencement of these Chapter 11

Cases, and as discussed in greater detail in the Cesarz Declaration (as defined in the DIP Motion), the Debtors commenced a marketing process led by PWP to obtain postpetition financing for the Debtors' business.  I understand that PWP actively solicited interest from third party lenders in providing postpetition financing to the Debtors.

93.    I am informed that a number of parties that PWP contacted expressed interest in providing DIP financing, and that each indicated a willingness to consider providing a senior secured debtor-in-possession financing facility.  Given the challenges, uncertainty, and legal expenses inherent to a priming dispute with the Prepetition 2026 Secured Noteholders, the Debtors concluded, in consultation with their advisors, that the risks of moving forward with alternative lenders (including the risk of extensive litigation while the Debtors are in an active sale process) would outweigh any incremental economic benefits that may have resulted from an alternative loan.  In addition to the cost and delay that would have been created by a priming dispute and contested cash collateral hearing at the outset of these cases, I believe that if the Debtors had not reached a deal with the Prepetition 2026 Secured Noteholders prior to the Petition Date, these Chapter 11 Cases generally would have involved significant, ongoing contention with the Prepetition 2026 Secured Noteholders, greatly hindering the Debtors' ability to conduct a sale process to maximize value for the benefit of the estates and all creditors.

94.    I also believe that the terms of the DIP Facility were negotiated at arms' length and in good faith.  Negotiations with the Prepetition 2026 Secured Noteholders spanned several weeks leading up to the Petition Date.  Throughout these discussions, and as explained in more detail in the Cesarz Declaration, the Debtors and their advisors engaged in an extensive dialogue with the Prepetition 2026 Secured Noteholders regarding the proposed DIP Facility.  The Debtors, with the assistance of their advisors, were able to achieve favorable economics and other material terms.

Taken together with the ability to commence these cases with the support of their prepetition secured lenders, these favorable terms made the DIP Facility the most attractive postpetition financing offer.

95.     For the foregoing reasons, I believe that the DIP Facility embodies the best available financing under these circumstances and that entry into the DIP Facility, coupled with consensual use of cash collateral, is in the best interests of the Debtors, their estates, and all of their stakeholders.

96.     I have reviewed each of the First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the type of relief sought in each of the First Day Motions: (i) as applicable, is necessary to avoid immediate and irreparable harm; (ii) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations; and (iii) is in the best interests of the Debtors and their stakeholders.

## CONCLUSION

97.     For the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, along with such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

I certify under penalty of perjury that, based upon my knowledge, information and belief

as set forth herein, the foregoing is true and correct.

Executed: February 5, 2024

<div style="text-align:center;">

*/s/ R. Bradley Gray*        
R. Bradley Gray
President and Chief Executive Officer

</div>

## EXHIBIT A

**Organizational Chart**



# NanoString Technologies Corporate Structure



[1] All direct holdings by NanoString Technologies, Inc. are 100% of the entity directly below, and same for NanoString Technologies International, Inc., which holds 100% of the ownership of the subsidiaries below.

[2] Country / State listed designates entity's place of organization.