**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NANOSTRING TECHNOLOGIES, INC., *et al.*,[1] | Case No. 24-10160 (CTG) |
| | (Jointly Administered) |
| Debtors. | **Ref. Docket Nos. 520, 521, 522** |

**PREPETITION NOTEHOLDERS' OBJECTION TO
MOTION FOR APPROVAL OF DEBTORS' DISCLOSURE STATEMENT**

Braidwell Partners Transaction Master Fund LP and Deerfield Partners, L.P. (collectively, the "Prepetition Noteholders"), as holders of notes issued by the Debtors pursuant to that certain Indenture, dated as of November 7, 2023 (as amended, restated, supplemented, waived, or otherwise modified as of the date hereof, the "Prepetition First Lien Indenture" and the notes issued thereunder, the "Prepetition First Lien Notes"), hereby submit this objection to the *Debtors' Motion for an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures, Including (A) Fixing the Voting Record Date, (B) Approving the Solicitation Packages and Procedures for Distribution, (C) Approving the Form of the Ballots and Establishing Procedures for Voting, (D) Approving Procedures for Vote Tabulation; and (E) Waiving the Requirement Under the Bankruptcy Rules to Solicit Votes of Holders of Interests; (III) Scheduling a Confirmation Hearing and Establishing Notice and Objection Procedures; (IV) Shortening the Notice Period for the Confirmation Hearing; and (V) Granting Related Relief*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are NanoString Technologies, Inc. (4687), NanoString Technologies International, Inc. (2723), NanoString Technologies Netherlands B.V., and NanoString Technologies Germany GmbH. The Debtors' headquarters is located at 530 Fairview Avenue North, Suite 2000, Seattle, WA 98109.

[Docket No. 522] (the "<u>Motion</u>").[2]  For the reasons explained herein, the Disclosure Statement should not be approved because the Debtors' proposed Plan is patently unconfirmable.

<b><u>PRELIMINARY STATEMENT</u></b>

1.      Due to the success of the Debtors' sale process and the Prepetition Noteholders' settlement with the Committee that substantially decreased the administrative cost of these Chapter 11 Cases, the Debtors appear to now be solvent, and able to pay unsecured creditors in full in cash. Because the Debtors are solvent, unsecured creditors, including the Prepetition Noteholders, are entitled to post-petition interest on their allowed claims.  The Debtors' Plan, contrary to applicable law, proposes to (i) pay the Prepetition Noteholders post-petition interest at their contractual non-default interest rate, rather than their contractual default interest rate, and (ii) unilaterally reduce distributions on the Prepetition Noteholders' settled and allowed claims by over $2 million.  As described herein, the Debtors have been in default under the Prepetition First Lien Indenture since before the Petition Date, and the Prepetition Noteholders are therefore entitled to post-petition interest under the Plan at the contractual default interest rate.  The Prepetition Noteholders do not consent to the Plan's treatment of their Prepetition Noteholder Claims (as defined below), and intend to vote to reject the Plan unless modified.  For the reasons stated herein, the Plan is patently unconfirmable without the Prepetition Noteholders' support, and the Motion should be rejected unless the Debtors revise the Plan to provide the legally requisite treatment for the Prepetition Noteholders' claims.

2.      The Debtors' proposed treatment of the Prepetition Noteholders' remaining claims is particularly frustrating given the history of these cases.  Leading up to and during these Chapter

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion, *Disclosure Statement for the Chapter 11 Plan of NanoString Technologies, Inc. and its Affiliated Debtors* [Docket No. 520] (the "<u>Disclosure Statement</u>"), or the *Chapter 11 Plan of NanoString Technologies, Inc. and its Affiliated Debtors* [Docket No. 519] (the "<u>Plan</u>").

11 Cases, the Prepetition Noteholders have supported the Debtors, and yet the Debtors have a history of attempting to deprive the Prepetition Noteholders of the benefit of their contracted-for rights.

3.     On November 6, 2023, the Prepetition Noteholders entered into that certain Exchange Agreement, dated as of November 6, 2023 (the "Exchange Agreement").  Pursuant to the Exchange Agreement, the Prepetition Noteholders exchanged approximately $216 million of the Debtors' existing 2025 Notes for the Prepetition First Lien Notes.  As a result of the extended maturity date and ability to pay all interest for a year under the Prepetition First Lien Notes in kind, the Exchange Agreement, according to the Debtors' then Chief Financial Officer, "provide[d] the window needed for us to achieve profitability prior to maturity" and would assist as the Debtors "work[ed] to optimize our cash burn and profitability profile."[3]

4.     Shortly after closing the Exchange Agreement, and extracting the value thereunder from the Prepetition Noteholders, the Debtors voluntarily defaulted.  Among other things, on or before January 6, 2024, the Debtors were required to provide control agreements over their deposit accounts.  *See* Prepetition First Lien Indenture, § 4.12.  The Debtors refused to comply with this obligation, creating an immediate "Event of Default" under the Prepetition First Lien Indenture. *Id.* § 6.01(d)(i).[4]  On January 11, 2024, the Prepetition Noteholders delivered a letter to the Debtors providing notice of this Event of Default (the "Notice of Default").[5]  The Debtors have never disputed the existence of this Event of Default, and the Event of Default was not cured at the time of the Petition Date.  As a result of the Events of Default under the Prepetition First Lien Indenture,

---

[3]    *See NanoString Technologies Releases Operating Results for Third Quarter of 2023* (Nov. 6, 2023), available at *https://investors.nanostring.com/news/news-details/2023/NanoString-Technologies-Releases-Operating-Results-for-Third-Quarter-of-2023*.

[4]    This is not an exhaustive list of the defaults or Events of Default under the Prepetition First Lien Indenture.  In addition to the Event of Defaults identified herein, the commencement of the Chapter 11 Cases constituted an Event of Default under the Prepetition First Lien Indenture.  Prepetition First Lien Indenture, § 6.01(d).

[5]    A true and correct copy of the Notice of Default is attached hereto as Exhibit A.

interest during the Chapter 11 Cases accrues at the default rate of 10.95%, not the non-default rate of 6.95%.  Prepetition First Lien Indenture, § 2.03(d) ("[a]ny Defaulted Amounts shall accrue interest per annum at the rate borne by the notes *plus* four percent (4%)").

5.    The Prepetition Noteholders' support has extended into the Chapter 11 Cases. Notwithstanding the Debtors commencing these cases within 90 days of the closing of the Exchange Agreement, the Prepetition Noteholders funded $47.5 million in new-money debtor-in-possession financing to fund these Chapter 11 Cases and the Debtors' sale process.  Further, in an effort to stem what would have otherwise been a distracting and expensive litigation between the Prepetition Noteholders and the Committee, the Prepetition Noteholders agreed to waive their negotiated for roll-up of prepetition debt in connection with the DIP Financing, and agreed that only $25 million of the Prepetition First Lien Notes would be treated as secured, with the remainder of their claims under the Prepetition First Lien Notes allowed as unsecured claims.  *See* Final DIP Order ¶¶ 46–47.  Specifically, under the Final DIP Order, the following amounts under the Prepetition First Lien Notes were allowed as unsecured claims (i) $195,116,545.38 of Prepetition Noteholder Unsecured Claims, and (ii) $43,412,432.77 of Prepetition Noteholder Unsecured Subordinated Claims (comprised of the make-whole claim under the Prepetition First Lien Indenture) (collectively, the "Prepetition Noteholder Claims").  Final DIP Order ¶ 46. The Prepetition Noteholder Unsecured Claims are *pari passu* with other general unsecured creditors, and the Prepetition Noteholders agreed to subordinate the Prepetition Noteholder Unsecured Subordinated Claims to other general unsecured creditors.  *Id.*  The Prepetition Noteholders' concessions under the Final DIP Order saved the estate potentially tens of millions of dollars by, among other things, avoiding the incurrence of Committee and Prepetition Noteholder professional

fees that would have been borne by the Debtors' estates.[6]

6.      Now, having extracted the liquidity and concessions from the Prepetition Noteholders necessary to get the Chapter 11 Cases to this point, where the Debtors are solvent, the Debtors seek to further deprive the Prepetition Noteholders of their contractual rights by unilaterally and unjustifiably limiting (i) post-petition interest on the Prepetition Noteholder Claims to contractual non-default rates, rather than the default rate owed under the Prepetition First Lien Indenture, and (ii) distributions on the Prepetition Noteholder Unsecured Subordinated Claims by over $2 million less than the amount allowed under the Final DIP Order.  *See* Plan ¶¶ 1.85 (providing for post-petition interest "at the contract rate of 6.95%" on the Prepetition Noteholder Unsecured Claims), 1.86 (providing for post-petition interest "at the contract rate of 6.95%" on the Prepetition Noteholder Unsecured Subordinated Claims), 3.2.4, 3.3.1 (providing for payment of approximately $41.1 million on the allowed $43.4 million Prepetition Noteholder Unsecured Subordinated Claims).

7.      As explained herein, the Plan's treatment of the Prepetition Noteholder Clams is not consistent with recent case law, including case law within the Third Circuit.  This renders the Plan patently unconfirmable for several reasons.  Most obviously, the Prepetition Noteholder Unsecured Subordinated Claims are the only impaired claims voting on the Plan.  Plan ¶¶ 2.3, 3.3.1.  The Prepetition Noteholders do not approve the Plan.  As a result, the Debtors do not have an impaired class of creditors willing to accept the Plan, as required under Bankruptcy Code section 1129(a)(10).

---

[6]    In support of the settlement reflected in the Final DIP Order, the Debtors' counsel stated as follows: "This global settlement obviously eliminates significant expense and a lot of uncertainty associated with litigating.  We're going to save just on the facility alone amount $1.3 million in DIP financing costs.  But in addition to that, as your Honor well knows, we have saved millions and millions of dollars and lots of weeks of litigation."  Hr'g Tr. p. 7:23–8:3.

8.      By depriving the Prepetition Noteholders of what the Bankruptcy Code and
previous orders of this Court entitles them, the Debtors have needlessly imperiled confirmation at
the outset.   The Court should not let the Debtors bleed away estate resources on a fruitless
endeavor.   The Motion should be denied, unless the Debtors modify the Plan to resolve the flaws
identified by the Prepetition Noteholders.

## **OBJECTION**

## I.     **THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE THE PLAN IS PATENTLY UNCONFIRMABLE.**

9.      A disclosure statement that describes a chapter plan that is unconfirmable should
not be approved. *See In re Am. Cap. Equip., LLC,* 688 F.3d 145, 154–55 (3d Cir. 2012) ("[I]f it
appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may
consider and resolve that issue at the disclosure stage. . . .   The debtor has the burden of proving
that a disclosure statement is adequate, including showing that the plan is confirmable") (citations
omitted) (internal quotation marks omitted); *see also In re Quigley Co., Inc.*, 377 B.R. 110, 115–
16 (Bankr. S.D.N.Y. 2007); *In re CRIIMI MAE, Inc.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000); *In
re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996). A plan is "patently
unconfirmable where (1) confirmation defects cannot be overcome by creditor voting results, and
(2) those defects concern matters upon which all material facts are not in dispute or have been fully
developed at the disclosure statement hearing." *Am. Capital Equip.*, 688 F.3d at 154-55 (cleaned
up).

10.     The Plan here is patently unconfirmable for three independent reasons.  *First*, the
Plan's only voting Class of Claims is Class 5, which consists of the Prepetition Noteholder
Unsecured Subordinated Claims.  Without the Prepetition Noteholders' vote to approve the Plan
on account of the Prepetition Noteholder Unsecured Subordinated Claims, the Debtors do not have

an impaired consenting class, as required under Bankruptcy Code section 1129(a)(10).   The

Prepetition Noteholders do not support the Plan in its current form.   *Second*, the Plan violates the

absolute priority rule by not paying the Prepetition Noteholder Unsecured Subordinated Claims in

full, while providing a potential distribution to equity-holders.   *See* 11 U.S.C. § 1129(b)(2)(B)(ii).

*Third*, the Plan wrongly classifies the Prepetition Noteholder Claims as unimpaired while

simultaneously compromising their contractual rights under the Prepetition First Lien Indenture

by depriving them of default interest.   *See* 11 U.S.C. § 1124(1).

11.      Accordingly, the Motion for approval of the Disclosure Statement should be denied.

**A.      The Plan Lacks an Impaired Consenting Class.**

12.      The Plan is unconfirmable because Class 5 (consisting only of the Prepetition

Noteholder Unsecured Subordinated Claims) is the only impaired voting Class under the Plan, and

the Prepetition Noteholders, as the only holders of Claims in Class 5, do not support the Plan.   The

Prepetition Noteholders have raised with the Debtors several concerns with the current version of

the Plan.   Most notably, the Prepetition Noteholders do not support the Plan because it unilaterally

and without explanation seeks to deprive the Prepetition Noteholders of their contractual right to

default interest under the Prepetition First Lien Indenture.   Rather, the Debtors are seeking a multi-

million dollar windfall for equity-holders by capping post-petition interest on the Prepetition

Noteholder Claims at the contractual non-default rate.   In doing so, they are ignoring the fact that

the Debtors unilaterally determined to materially breach the Prepetition First Lien Indenture by

voluntarily triggering Events of Default months after completion of the Exchange Agreement,

giving rise to the Prepetition Noteholders' right to default interest.

13.      Both the Fifth and Ninth Circuit Courts of Appeal have recently confirmed that the

"solvent debtor exception" requires payment of post-petition interest to unsecured creditors at their

state law or contractual default rates of interest (as applicable) in order to provide unimpaired

treatment to such claims, and before any recovery can be realized by prepetition equity-holders. *In re Ultra Petroleum Corp.*, 51 F.4th 138, 145 (5th Cir. 2022), *cert. denied sub nom. Ultra Petroleum Corp. v. Ad Hoc Comm. of OpCo Unsecured Creditors*, 143 S. Ct. 2495, 216 L. Ed. 2d 454 (2023) ("We conclude that in this solvent-debtor case, the contractual default rate is appropriate."); *In re PG&E Corp.*, 46 F.4th 1047, 1064 (9th Cir. 2022) ("'[A]bsent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights.' We are confident that in most solvent-debtor cases involving unimpaired creditors, the equitable role of the bankruptcy court will be 'simply to enforce creditors' rights according to the tenor of the contracts that created those rights.'" (quoting *Ultra Petroleum*, 943 F.3d at 765; *Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986)).[7] These decisions are not outliers. As the Sixth Circuit recognized, "[c]ourts in solvent debtor cases have overwhelmingly concluded that there is a presumption that the default interest rate should be allowed." *In re Dow Corning Corp.*, 456 F.3d 668, 680 (6th Cir. 2006) (citations omitted).[8]

14.     The above line of cases is also consistent with courts' general enforcement of contractual default provisions and interest rates in bankruptcy. *See, e.g.*, *In re Ace-Texas, Inc.*, 217 B.R. 719, 723 (Bankr. D. Del. 1998) (in the context of section 506(b), holding that "[t]o

---

[7]    In *In re Hertz Corp.*, 637 B.R. 781 (Bankr. D. Del. 2021), Judge Walrath held that post-petition interest in a solvent debtor case need only be paid at the federal judgment rate, rather than pursuant to a creditor's contract rate. This decision is currently pending before the Third Circuit, with argument held in October 2023. The Prepetition Noteholders endorse the arguments the appellants in *Hertz* (represented by the same legal counsel as represents the Debtors here) that post-petition interest should be paid at contractual default rates, and that the lower court opinion should be overruled. Notably, not even *Hertz* supports unilaterally depriving creditors of contractual default rates when the debtor acknowledges that the contract rate applies.

[8]    In *In re Coram Healthcare Corp.*, 315 B.R. 321, 347 (Bankr. D. Del. 2004), Judge Walrath found that under "peculiar facts," where there was evidence of conflicts of interest caused by a consultation agreement between the debtor's CEO and a noteholder asserting a right to post-petition interest, default interest should not be allowed. No such "peculiar facts" exist here, where all interactions between the Prepetition Noteholders and the Debtors have been at arms' length.

determine the proper interest rate, courts employ a presumption in favor of the contractual rate of interest subject to rebuttal based upon the equitable considerations specific to each case"); *Gencarelli v. UPS Cap. Bus. Credit*, 501 F.3d 1, 7 (1st Cir. 2007) (in ruling on the enforceability of a contractual prepayment penalty, holding that "[w]hen the debtor is solvent, 'the bankruptcy rule is that where there is a *contractual* provision, valid under state law, . . . the bankruptcy court will enforce the contractual provision.'") (quotation omitted) (emphasis in original); *In re Energy Future Holdings. Corp.*, 513 B.R. 651, 659 (Bankr. D. Del. 2014) ("The District of Delaware, as well as other courts, have tended to agree with the holding of *Gencarelli*.").[9]

15.    In sum, based on the substantial line of authority enforcing creditors' rights to contractual default interest, the Prepetition Noteholders do not support the Debtors' attempt to run roughshod over their rights through the proposed Plan.  The Prepetition Noteholders acknowledge that this is typically a confirmation objection, as it depends on the voting results.  However, in this case, where the Court has been apprised of the fact that the only voting impaired class of creditors oppose confirmation and will vote to reject, it would needlessly waste estate resources for the Debtors to nevertheless solicit support.  The Court should instead direct the Debtors to engage in good-faith negotiations, in which the Prepetition Noteholders are willing and able to be constructive, in order to produce a plan that respects the rights of the Prepetition Noteholders and, which in turn, can garner their necessary support.

---

[9]    *See also Gen. Elec. Cap. Corp. v. Future Media Prods., Inc.*, 547 F.3d 956, 961 (9th Cir. 2008) ("The bankruptcy court should apply a presumption of allowability for the contracted for default rate, provided that the rate is not unenforceable under applicable nonbankruptcy law.") (internal quotation marks and citations omitted); *Matter of Laymon*, 958 F.2d 72, 75 (5th. Cir. 1992) (explaining that the contract rate applies absent inequitable or unconscionable result); *Matter of Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994) (noting "presumption in favor of the contract rate subject to rebuttal based upon equitable considerations"); *In re Los Angeles Dodgers LLC*, 465 B.R. 18, 32–33 (D. Del. 2011) ("[T]he equities strongly favor holding the debtor to his contractual obligations so long as those obligations are legally enforceable under applicable non-bankruptcy law.") (quoting *Gencarelli*, 501 F.3d at 7 (1st Cir. 2007)).

**B.      The Plan Violates the Absolute Priority Rule Because It Provides a Potential Return to Equity Without Satisfying the Prepetition Noteholder Unsecured Subordinated Claims in Full.**

16.      The Plan classifies the Allowed Prepetition Noteholder Unsecured Subordinated Claims in Class 5 as impaired.  As noted above, the Prepetition Noteholders do not support the Plan as currently proposed.  Thus, the Debtors must satisfy Bankruptcy Code section 1129(b)(2) of the Bankruptcy Code, which requires that the Prepetition Noteholders receive a recovery equal to the allowed amount of their claim (i.e., the Allowed Prepetition Noteholder Unsecured Subordinated Claims) or that holders of claims and interests junior to Class 5 will not receive or retain anything other the plan.  Neither is true here.

17.      The amount of the Allowed Prepetition Noteholder Unsecured Subordinated Claims has already been established.  Under the Final DIP Order, the Prepetition Noteholder Unsecured Subordinated Claims were allowed in an amount of $43.4 million, based on negotiations by the Debtors, the Committee, and the Prepetition Noteholders, and their respective legal and financial advisors.  Yet, the Plan only provides for payment of $41.1 million on account of these Claims—a more than $2 million reduction—while also providing for a distribution to equity-holders.  Plan ¶¶ 3.3.1, 3.4.3.  This does not satisfy Bankruptcy Code section 1129(b)(2). For this additional reason, the Plan is patently unconfirmable in its present form.

**C.      The Plan Improperly Classifies the Prepetition Noteholder Unsecured Claims as Unimpaired.**

18.      Finally, the Plan is unconfirmable because it classifies the $195 million Prepetition Noteholder Unsecured Claims in Class 4 as unimpaired, while "alter[ing] the legal, equitable, and contractual rights" of the Prepetition Noteholders with respect to such claims.  As explained above, the Prepetition Noteholders are entitled to contractual default interest on the Prepetition Noteholder Unsecured Claims.  Under *Ultra* and *PG&E*, the Plan must pay post-petition interest

at such contract default rate in order to unimpair the Prepetition Noteholder Unsecured Claims. *In re Ultra Petroleum Corp.*, 51 F.4th at 145; *In re PG&E Corp.*, 46 F.4th at 1064.  By limiting the Prepetition Noteholders' post-petition interest to the non-default rate under the Prepetition First Lien Indenture, they are impairing the Prepetition Noteholder Unsecured Claims under Bankruptcy Code section 1124.  This treatment further renders the Plan patently unconfirmable.

## RESERVATION OF RIGHTS

19.     The Prepetition Noteholders have raised additional concerns with the Plan, which are not addressed in this Objection.  The Prepetition Noteholders reserve all of their rights to object to confirmation of the Plan, whether or not the bases for such objection are expressly referred to herein.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Prepetition Noteholders respectfully request that the Court (i) deny the Motion, and (ii) grant such other and further relief as the Court deems just and proper.

Dated:  May 14, 2024
Wilmington, Delaware


LANDIS RATH & COBB LLP       LANDIS RATH & COBB LLP


/s/ Matthew B. McGuire            /s/ Matthew B. McGuire
Adam G. Landis (No. 3407)      Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)   Matthew B. McGuire (No. 4366)
919 N. Market Street, Suite 1800   919 N. Market Street, Suite 1800
Wilmington, DE  19801         Wilmington, DE  19801
Telephone:  (302) 467-4410     Telephone:  (302) 467-4410
Email: landis@lrclaw.com       Email: landis@lrclaw.com
     mcguire@lrclaw.com           mcguire@lrclaw.com


        -and-                   -and-

SULLIVAN & CROMWELL LLP    GIBSON DUNN & CRUTCHER LLP
Ari Blaut (admitted *pro hac vice*)    David M. Feldman (admitted *pro hac vice*)
Benjamin Beller (admitted *pro hac vice*)  Michael S. Neumeister (admitted *pro hac vice*)
125 Broad Street             Jonathan M. Dunworth (admitted *pro hac vice*)
New York, NY 10004         200 Park Avenue
Telephone:  (212) 558-1656     New York, NY 10166
Facsimile:  (212) 558-3588      Telephone:  (212) 351-2366
Email: blauta@sullcrom.com     Facsimile:  (212) 351-6366
     bellerb@sullcrom.com      Email: dfeldman@gibsondunn.com
                           mneumeister@gibsondunn.com
                           jdunworth@gibsondunn.com


*Counsel to Deerfield Partners, L.P.*    *Counsel to Braidwell Partners Transaction Master Fund LP*